UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------- X
                                                          :

UNITED STATES OF AMERICA,         :

                                                          :   **MEMORANDUM**

                         Plaintiff,       :   **DECISION AND ORDER**

                                                          :

                 - against -        :   CR-08-240-14 (BMC)

                                                          :

JOEL CACACE,                        :

                                                          :

                        Defendant.       :

                                                          :

---------------------------------------------------------- X

**COGAN,** District Judge.

       This case is before me on the Government's motion for an anonymous and partially sequestered jury [1798]. Defendant has opposed the Government's motion but has requested, in the event the Court grants the Government's motion, permission to use jury questionnaires [1808]. Both the Government's motion for an anonymous and partially sequestered jury and defendant's request seeking permission to use jury questionnaires are granted.

## BACKGROUND

       Defendant, a member of the Colombo organized crime family of La Cosa Nostra, is charged in the seventh superseding indictment with the murder in-aid-of-racketeering of Ralph Dols, which was allegedly committed in connection with defendant's leadership of the Colombo family.[1] The Government alleges that on August 25, 1997, defendant, together with co-defendants Thomas Gioeli and Dino Saracino, and two co-conspirators who later became cooperating witnesses ("CW-1" and "CW-2"), participated in the murder of Dols. At the time of

---

[1] Defendant held the position of consigliere, or counselor, within the Colombo family, which made him its third-highest-ranking member and part of the crime family's ruling "administration." The Court has previously described the alleged structure, purpose, and history of the Colombo family, see e.g., United States v. Gioeli and Saracino, 08-cr-240 (BMC) (Docket Entry 1195) (granting the Government's request for an anonymous and partially sequestered jury).

his murder, Dols was a New York City police officer and the husband of defendant's ex-wife. The Government further alleges that defendant ordered Dols' murder, and Gioeli conveyed that order to CW-1. On the night of the murder, Saracino, CW-1 and CW-2 waited for Dols to return to his home in Brooklyn. As Dols parked his car in front of his building, Saracino and CW-1 shot Dols multiple times. Dols died from the gunshot wounds a short time after he was discovered by police officers.

In 2004, defendant was convicted of racketeering, in violation of 18 U.S.C. § 1962(c), in United States v. Cacace, et al., 03-cr-72 (SJ) (E.D.N.Y.) ("Cacace I"). The conviction was based on two predicate racketeering acts; the first predicate racketeering act was defendant's participation in the conspiracy to murder a prosecutor named William Aronwald, and the second act was the murder of a judge named George Aronwald, William's father. The Presentence Investigation Report ("PSR") filed in that case described that in 1987, defendant accepted orders to murder William Aronwald and another former prosecutor, in retaliation for the "disrespectful" manner in which they prosecuted members of organized crime.

The PSR further states that in early 1987, defendant and Eddie Carini, a member of defendant's crew, began surveilling the law office of William Aronwald. Defendant's crew, however, mistakenly reported to the office of his father, George Aronwald. George Aronwald was followed and closely monitored by defendant's crew; their observations were reported to defendant and a murder plan was formulated. On March 20, 1987, the crew followed George Aronwald in close proximity to his residence; as he entered a laundromat, Eddie Carini followed him and fired numerous shots, striking and immediately killing the victim. Defendant was

sentenced to a term of imprisonment of 240 months in Cacace I, to be followed by a term of supervised release of five years, and is presently still serving this sentence.[2]

## DISCUSSION

I.  **An Anonymous and Partially Sequestered Jury**

The Government requests that: (1) the identities of all prospective jurors – including their names, addresses, and places of employment – not be revealed to either the parties or their attorneys; and (2) each juror be escorted by representatives of the United States Marshals Service to and from the courthouse each day and at all times during recesses from the time they are empanelled until the conclusion of the trial. As the Court has recognized in ruling on a similar motion by the Government in the Gioeli and Saracino criminal trial, these types of precautionary measures have "serious implications for a defendant's interest in effectively conducting *voir dire* and in maintaining the presumption of innocence." United States v. Wong, 40 F.3d 1347, 1376 (2d Cir. 1994). Nevertheless, it is well settled that, "when genuinely called for and when properly used, anonymous juries do not infringe a defendant's constitutional rights." United States v. Vario, 943 F.2d 236, 239 (2d Cir. 1991); see also Wong, 40 F.3d at 1376.

The Second Circuit has adopted a two-step inquiry for evaluating whether a court should empanel an anonymous jury. First, I must consider whether there is "strong reason to believe that the jury needs protection." See United States v. Amuso, 21 F.3d 1251, 1265 (2d Cir. 1994) (quoting United States v. Thomas, 757 F.2d 1359, 1365 (2d Cir. 1985)). If so, I must take "reasonable precaution[s] . . . to minimize the effect that such a decision might have on the jurors' opinions of the defendants." Id. (quoting Thomas, 757 F.2d at 1365). In making my

---

[2] The Government mentions the fact that the PSR submitted in Cacace I alleged other crimes committed by defendant, specifically, defendant's alleged conspiracy to murder Carmine Variale and the murder of Variale and Frank Satora, as well as the conspiracy to murder and the murder of Carlo Antonino. The Court need not determine whether it is appropriate to consider allegations in the PSR of defendant's other crimes, since the presently charged crime and the other circumstances here are sufficient to grant the Government's motion.

3

initial determination, relevant factors to consider include: (1) the seriousness of the charges; (2) the dangerousness of defendant; (3) defendant's ability to interfere with the jury, either by himself or through a criminal organization of which he is a member; (4) previous attempts to interfere with the judicial process by defendant or his associates; and (5) the expectation of publicity. See United States v. Gotti, 459 F.3d 296, 345–46 (2d Cir. 2006); United States v. Thai, 29 F.3d 785, 801 (2d Cir. 1994); United States v. Paccione, 949 F.2d 1183, 1192 (2d Cir. 1991). In making this evaluation, I can rely on the Government's proffer of facts showing that the jury needs protection. See Wong, 40 F.3d at 1376-77.

While the Second Circuit has approved the use of anonymous juries in cases involving defendants with ties to organized crime, see e.g., Gotti, 459 F.3d 296; Amuso, 21 F.3d 1251, the Circuit has emphasized that the mere fact that a case involves organized crime does not, by itself, justify the use of an anonymous jury. See Vario, 943 F.2d at 241 (explaining that there must be some kind of showing such as a "demonstrable history or likelihood of obstruction of justice on the part of the defendant," or "a pattern of violence by the defendant and his associates such as would cause a juror to reasonably fear for his own safety").

There is ample reason to grant the Government's request. First, there is no question that the charge brought against defendant, murder-in-aid of racketeering of Ralph Dols, a police officer, is serious. Second, I find that there is a sufficient basis to believe that defendant may be dangerous, as demonstrated by his prior conviction and the fact that he held the position of consigliere within the Colombo family, an organization that has allegedly generated money for its members through a wide range of criminal activities, including drug trafficking, robbery, extortion, and even murder.

The third and fourth factors also weigh in favor of a finding that the jury needs protection. Defendant has been convicted of racketeering based on the predicate acts of murdering a judge and conspiracy to murder a prosecutor. These acts, as well as the alleged act of murdering a police officer, demonstrate that defendant possesses the capacity and willingness to resort to physical violence, including murder, to protect his personal interests. The fact that the victims of these crimes were government officials is an even greater indicator of defendant's willingness to pursue his personal interests at all costs.

Furthermore, as the Government details in its motion papers, the Colombo family has a decades-long history of engaging in obstructive conduct, including jury tampering. In a 1994 criminal case against Alphonse Persico, once an acting boss of the Colombo family, Judge Sifton ordered an anonymous jury because, among other things, a government source "advised agents of the Federal Bureau of Investigation that a high ranking member of the Persico faction has said that efforts would be made to tamper with the jury in order to avoid a conviction." United States v. Persico, No. 92-cr-351 (CPS), 1994 WL 150837, at *2 (E.D.N.Y. Apr. 20, 1994). In 2007, Persico and another Colombo member, John DeRoss, were convicted of murder-in-aid of racketeering and of tampering with three witnesses in regard to the murder investigation.

In addition, in 1998, Andrew Russo and Dennis Hickey (both Colombo family members) were convicted of witness tampering, obstruction of justice, and hindering an investigation by the Federal Bureau of Investigation. See generally United States v. Russo, 302 F.3d 37 (2d Cir. 2002). Russo was involved in an attempt to contact one of the jurors in that case; then, when the Government began investigating Russo, he and a coconspirator hid a key witness to prevent her from being served with a grand jury subpoena.

The Government also argues, citing specific examples, that the Colombo family has murdered suspected informants and federal witnesses. The Government refers to a discussion, captured by court-authorized electronic surveillance, that Frank Leto, a Colombo family soldier, had with a fellow soldier in October 2000. Leto describes how the Colombo family should handle witnesses who cooperate with the government: "Anybody who becomes a rat, kill their wife, kill their kids, kill 'em all. . . ."

Finally, the Government describes how in 2007, Gioeli, who at the time was the street boss of the Colombo family, along with co-defendant Michael Catapano, at the time a captain, with others, attempted to tamper with a witness whom they believed had agreed to testify against an attorney who had been charged with promoting prostitution. Another example provided by the Government is Saracino's attempt to obstruct the Government's investigation of the affairs of the Colombo family by trying to persuade individuals who had been served with subpoenas, not to provide any incriminating evidence. Saracino was found guilty of prevention of testimony, withholding of testimony and records, and obstruction of an official proceeding.

Clearly, there is enough of a showing made to suggest that the Colombo family has the means to contact and harm jurors. See Thomas, 757 F.2d at 1365 (upholding use of anonymous jury because "there was strong evidence of defendants' past attempts to interfere with the judicial process" and because "defendants were alleged to be part of a group that possessed the means to harm jurors").

Finally, this case has already generated substantial media coverage. See, e.g., John Marzulli, Attorney General Eric Holder: No Death Penalty in Mob Murder Trial, N.Y. Daily News, Apr. 15, 2013; Mitchel Maddux, Dan Mangan, Hit On Cop Shocked Killer, N.Y. Post, Mar. 28, 2012; Mosi Secret, Witness Testifies How Plot to Kill Officer Was Set Up, N.Y. Times,

Mar. 27, 2012; Mitchel Maddux, Mob Turncoat Details the 1997 Slaying of NYPD Cop Ralph Dols, N.Y. Post, Mar. 27, 2012; John Marzulli, Birthday Serenade for Accused Cop Killer and Former Colombo Crime Boss Joel Cacace In Court, N.Y. Daily News, Apr. 9, 2010; John Marzulli, Former Colombo Family Boss Indicted in 1997 Murder of NYPD Cop Ralph Dols, N.Y. Daily News, Dec. 19. 2008. The media coverage will certainly increase as the trial begins. And, as the Second Circuit has recognized, "[p]re-trial publicity may militate in favor of an anonymous jury because it can 'enhance the possibility that jurors' names would become public and thus expose them to intimidation by defendants' friends or enemies, or harassment by the public.'" Vario, 943 F.2d at 240 (quoting United States v. Persico, 621 F. Supp. 842, 878 (S.D.N.Y. 1985)).

Based on the foregoing, it is clear that there is strong evidence to believe that the jury needs protection. I therefore grant the Government's request to use an anonymous and partially sequestered jury. The next issue I must determine is what reasonable precautions I must take "to minimize prejudicial effects on the defendant and to ensure protection of his fundamental rights." Thai, 29 F.3d at 801.

## II. Precautionary Measures to Minimize Potential Prejudice

Defendant submits that should the Court grant the Government's motion for an anonymous and partially sequestered jury, the Court must employ a detailed juror questionnaire, proposed by and with input from both parties, in order to minimize any potential prejudice to defendant. Defendant also requests that the Court give the jurors non-prejudicial reasons for preserving their anonymity that refrain from signaling that either defendant or any of his former associates poses a threat to their safety. Finally, defendant requests the appointment of a jury

7

selection expert to assist counsel in the drafting and review of the questionnaires and in the selection of a fair and impartial jury.

The Government opposes defendant's request that the Court employ a jury questionnaire should the Court grant the Government's motion. It argues that the implementation of a questionnaire is not necessary in this case because the Court can conduct "thorough and probing" *voir dire* without the use of a written questionnaire. The Government also contends that the use of questionnaires can actually impede the anonymity of the jurors; a potential juror's numerous responses to the questionnaire could, in the aggregate, serve to identify the particular juror.

As an initial matter, the Court notes that it has "ample discretion in determining how best to conduct the *voir dire*." Rosalez-Lopez v. United States, 451 U.S. 182, 189, 101 S. Ct. 1629, 1634 (1982); see also United States v. Treacy, 639 F.3d 32 (2d Cir. 2011). Next, the Court recognizes that courts routinely employ questionnaires to facilitate *voir dire* in a number of circumstances,

> e.g., where a large number of prospective jurors must be screened, see, e.g., United States v. Rahman, 189 F.3d 88, 121 (2d Cir. 1999) (approving court's use of comprehensive questionnaire in case involving over 500 prospective jurors); where an anonymous jury is to be empaneled, see, e.g., United States v. Thai, 29 F.3d at 801; where there has been extensive pre-trial publicity, see, e.g., United States v. Stewart, 433 F.3d at 303; or where the death penalty is sought, see, e.g., United States v. Wilson, 493 F. Supp. 2d 537, 544 (E.D.N.Y. 2007) (observing, in a capital case, that "[n]early 600 potential jurors came to this courtroom to fill out 56-page questionnaires prepared by the parties and by the court").

United States v. Quinones, 511 F.3d 289, 299-300 (2d Cir. 2007). Nearly all of these circumstances exist in the instant case; the Court anticipates that a large number of prospective jurors will be screened, an anonymous jury will be empaneled, there has been extensive pre-trial media coverage, and the Government, at one point, sought the death penalty against defendant. The Court therefore concludes that the use of a jury questionnaire, drafted with input from both parties, is appropriate to facilitate the *voir dire* process.

The Government's concern that the questionnaire may reveal the identities of the jurors is unfounded; the possibility that a juror's responses may reveal his identity exists even during the lawyers' oral questioning of the jurors. The Court expects that the parties will reduce such a risk of inadvertent identification by working together to carefully formulate questions that will uncover the jurors' biases while protecting their identities.

The parties agree that the Court should give a neutral, non-prejudicial instruction to the jury that explains the reason for their anonymity. The Court will accept the parties' proposed instruction prior to commencement of the trial.

Finally, the Court denies defendant's request for permission to hire a jury selection expert with CJA funds. Defendant has not provided, nor can the Court independently come up with, a reason why this case in particular requires an expert to assist defense counsel in drafting and reviewing questionnaires and in selecting a fair and impartial jury. Defendant has three experienced counsel who are more than capable of facilitating the selection of a fair and impartial jury.

## **CONCLUSION**

The Government's motion for an anonymous and partially sequestered jury [1798] is granted. Defendant's request for permission to use jury questionnaires [1808] is also granted.
**SO ORDERED.**

U.S.D.J.

Dated: Brooklyn, New York
September 6, 2013